USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/04/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARC COHEN a/k/a MOSHE COHEN,

Plaintiff,

-v-

NEW YORK CITY and EDWARD A. CABAN,

Defendants.

24-cv-2594 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Marc Cohen, also known as Moshe Cohen ("Plaintiff"), challenges the decision of the New York City Police Department ("NYPD") License Division to deprive him of his license to possess a firearm. Dkt. No. 1. Plaintiff and Defendants the City of New York and Edward A. Caban,[1] sued in his official capacity (collectively, "Defendants"), cross-move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment. Dkt. Nos. 37, 44.

For the following reasons, Plaintiff's motion is denied and Defendants' motion is granted.

## BACKGROUND

The following facts are taken from the parties' joint statement of material facts, their respective Local Civil Rule 56.1 statements and counterstatements, the evidence in the record,

[1] At the time of filing, Plaintiff named in his complaint then-NYPD Commissioner Edward A. Caban as a defendant in his official capacity. The current NYPD Commissioner is Jessica Tisch, who was appointed in November 2024. *See* Dkt. No. 47 ¶ 1 n.1. Federal Rule of Civil Procedure 25(d) provides that when a public official sued in his official capacity leaves office, his successor is automatically substituted as the defendant. Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."); *see Lewis v. Clarke*, 581 U.S. 155, 162 (2017) ("[W]hen officials sued in their official capacities leave office, their successors automatically assume their role in the litigation."). The Court thus deems the complaint to be amended to name Tisch as a substitute for Caban.

and information of which the Court may take judicial notice. In all instances, the evidence is construed in the light most favorable to the non-moving party on the relevant motion.

## I. The Licensing Regime for Firearms

New York State generally prohibits the possession of a firearm without a license. *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 85 (2d Cir. 2012). "Section 400.00 of the Penal Law 'is the exclusive statutory mechanism for the licensing of firearms in New York State.'" *Id.* at 85–86 (quoting *O'Connor v. Scarpino*, 638 N.E.2d 950, 951 (N.Y. 1994) (mem.)). That law grants authority to the "licensing officer" to grant, renew, suspend, or revoke a license. N.Y. Penal L. § 400.00. A license may not be issued or renewed until after an investigation has determined that the applicant has met the qualifications for receiving a license, including that the applicant be "of good moral character." *Id.* § 400.00(1), (4). "Good moral character" is defined to mean "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." *Id.* § 400.00(1)(b).[2]

The licensing process is administered at the city and county levels. *Id.* § 400.00(3). "These localities may establish and apply more restrictive licensing requirements than the State." *Frey v. City of New York*, 157 F.4th 118, 124 (2d Cir. 2025). With the exception of licenses issued pursuant to New York Penal Law § 400.01, a license may be revoked and cancelled at any time in New York City by the licensing officer. N.Y. Penal L. § 400.00(11). The grounds for revocation of a license include conviction of a licensee anywhere of a felony or serious offense

[2] Citations to § 400.00 in this section are to the current text. New York's Concealed Carry Improvement Act ("CCIA") added this definition of "good moral character" to § 400.00(1)(b), effective September 1, 2022. *See* 2022 N.Y. Laws ch. 371, §§ 1, 26. As discussed *infra*, the License Division suspended Plaintiff's license on July 9, 2021, and revoked it on July 8, 2022, before this definition took effect. *See* Dkt. Nos. 38-4, 38-8. The Final Agency Determination upholding the revocation issued on December 27, 2022. *See* Dkt. No. 47-16.

or a licensee at any time becoming ineligible to obtain a license, including engaging in conduct that would have resulted in the denial of a license. *Id.*

In New York City, the firearms "licensing officer" is the NYPD Commissioner. *See* N.Y. Penal L. § 265.00(10); N.Y.C. Admin. Code § 10-131(a)(1) ("The police commissioner shall grant and issue licenses hereunder pursuant to the provisions of article four hundred of the penal law."). The NYPD License Division (the "License Division"), operating with delegated authority from the NYPD Commissioner, is responsible for reviewing and responding to applications for handgun licenses in New York City. Dkt. No. 48 ¶ 5.

Title 38, Chapter 5 of the Rules of the City of New York (the "RCNY") governs the review and evaluation of licenses by the License Division. *See id.* ¶ 6. The RCNY describes five different types of handgun licenses that the Commissioner or their designee can grant. One of the types is a premises license, which requires the handgun to be safeguarded at the specific address indicated on the license and which is issued for the protection of a business or residence premises. 38 RCNY §§ 5-01(a), 5-23(a).[3] To obtain any license, the applicant must first submit an application form to the License Division. *Id.* § 5-05. The License Division then conducts an investigation. *Id.* §§ 5-02, 5-07. To obtain a premises license, the applicant must satisfy each of nine separate criteria. *Id.* § 5-02. Those criteria include that the applicant "[b]e of good moral character." *Id.* § 5-02(a).

The License Division has authority under § 5-10 to deny an application for a handgun license "where it is determined that an applicant lacks good moral character or that other good cause exists for denial, pursuant to New York State Penal Law § 400.00 (1)." *Id.* § 5-10.

[3] Citations in this section are to the rules in effect at the time of Plaintiff's arrest, suspension, and revocation. *See* Dkt. No. 48-1.

Section 5-10 lists 14 factors to be considered in making the determination whether the applicant "lacks good moral character" or other good cause exists for a license application to be denied. *Id.* One of those factors is that "[t]he applicant has been arrested, indicted or convicted for a crime or violation except minor traffic violations, in any federal, state or local jurisdiction." *Id.* § 5-10(a). Another is that "[t]he applicant has a poor driving history, has multiple driver license suspensions or has been declared a scofflaw by the New York State Department of Motor Vehicles." *Id.* § 5-10(h). A further factor is that "[o]ther information demonstrates an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or other good cause for the denial of the license." *Id.* § 5-10(n). Section 5-10 instructs that "[i]n evaluating incidents or circumstances pursuant to this section, the License Division shall consider all relevant factors, including but not limited to the number, recency and severity of incidents and the outcome of any judicial or administrative proceedings." *Id.*

Section 5-11 provides that "[a] handgun license may be suspended for a defined period or revoked upon evidence of any disqualification pursuant to this chapter." *Id.* § 5-11.

## II. The July 8, 2021 Incident

Plaintiff is a resident of Brooklyn, New York, who was issued a New York City premises license on August 19, 2019. Dkt. No. 1 ("Compl.") ¶¶ 4, 9–10; Dkt. No. 10 ¶ 10; Dkt. No. 40-1 ¶¶ 1–2. Plaintiff had one 9mm handgun registered to his premises license. Dkt. No. 40-1 ¶ 3.

Two years later, on July 8, 2021, while driving in New York City, Plaintiff was involved in a car collision with a NYPD vehicle that ultimately resulted in the drivers of three cars being transported to the hospital by ambulance. Dkt. No. 51 ¶¶ 1–2; Dkt. No. 40-1 ¶ 8. Plaintiff was driving a 2020 black Ford Explorer in a southbound direction on Coney Island Avenue toward the intersection of Coney Island Avenue and Forest Avenue. Dkt. No. 46 ¶ 2; Dkt. No. 40-1 ¶ 9.

Plaintiff claims that, at the time of the incident, he was delivering food to a cancer patient as a volunteer with the organization, Chai4Ever. Dkt. No. 40-1 ¶ 12. He had emergency lights affixed to his vehicle which were activated and a siren blaring from his vehicle which also was activated. Dkt. No. 46 ¶ 3; Dkt. No. 40-1 ¶ 13. As Plaintiff proceeded through a steady green light to cross over Forest Avenue, a marked NYPD police vehicle proceeded eastbound and entered the intersection. Dkt. No. 46 ¶ 6. Plaintiff claims that he heard no siren coming from the police car. *Id.* ¶ 7.

Plaintiff collided with the NYPD vehicle, and the police vehicle then crashed into a third vehicle, which was a for-hire vehicle. Dkt. No. 40-1 ¶¶ 9–10. Plaintiff's vehicle then hit a light pole, which fell onto the street. *Id.* ¶ 11. The accident rendered the driver of the marked NYPD vehicle semiconscious. The police officer in that car complained of pain on his entire body and suffered a concussion. Dkt. No. 51 ¶ 3. He was out of work for approximately six months as a result of injuries sustained from the collision. *Id.* ¶ 4. The driver of the third vehicle complained of head pain and whiplash. *Id.* ¶ 5.

At the time of the collision, the front windshield on Plaintiff's vehicle was tinted and one of Plaintiff's license plates was not affixed to the outside of his vehicle. *Id.* ¶¶ 6–7. Plaintiff testified at his deposition that he activated the lights on his vehicle because he thought they would "allow [him] to get clear traffic," Dkt. No. 40-1 ¶ 15, and that he had the siren installed "[t]o clear intersections while doing the procession or to get through urgent needs," *id.* ¶ 16. Plaintiff also testified that he was "[v]ery possibly" driving over the speed limit at the time of the accident, and that an intersection video of the accident depicted Plaintiff's vehicle crossing over double yellow lines and driving around multiple vehicles that were stopped at a light. *Id.* ¶ 17. Plaintiff did not believe that his driving was reckless or dangerous. *Id.* Plaintiff further testified

that he believed the NYPD officer was at fault for the accident, that the NYPD vehicle should have yielded to his lights and siren, that he had no obligation to yield to the NYPD vehicle's lights or siren, and that he considered his Ford Explorer to be an emergency vehicle at the time. *Id.* ¶ 18.

Plaintiff did not have possession of any firearms in his vehicle at the time of the accident. *Id.* ¶ 14. Prior to the July 8, 2021 incident, Plaintiff's handgun license had never before been suspended or revoked. Dkt. No. 46 ¶ 1.

Plaintiff was subsequently arrested and charged with the following offenses under the New York Penal Law and New York Vehicle and Traffic Law ("VTL"): Reckless Endangerment in the Second Degree (Penal L. § 120.20); Reckless Driving (VTL § 1212); Improper Use of Amber Light (VTL § 375(41)(3)(b)); Equipment Violation: Front Windshield Nontransparent (VTL § 375(12-a)(b)(1)); Unauthorized Colored Lights on Vehicle (VTL § 375(41)(1)); License Plate Violation: Regular Plate Display (VTL § 402(1)); Failure to Obey Traffic Device (VTL § 1110(a)) (2 counts); Traffic Device Violation: Red (VTL § 111(d)(1)); Right of Way Violation: Emergency M/V (VTL § 1144(a)); Collide with Emergency Vehicle (VTL § 1144-a); and Speed Violation: Imprudent Speed (VTL § 1180(a)). Dkt. No. 40-1 ¶ 19; Dkt. No. 47-4.

Plaintiff did not report his arrest to the License Division. Instead, the New York State Department of Criminal Justice Services notified the License Division of Plaintiff's July 8, 2021 arrest on July 9, 2021. Dkt. No. 51 ¶ 10.

**III. The Revocation of Plaintiff's License**

The day after the collision, after the License Division was notified about Plaintiff's arrest, the incident was assigned to Officer Perrone for investigation. Dkt. No. 40-1 ¶ 25. The License Division issued a Notice of Determination dated July 9, 2021, informing Plaintiff that, in accordance with 38 RCNY § 5-30, his Premises Residence Handgun License was temporarily

suspended while the circumstances regarding the incident leading to his arrest were investigated. Dkt. No. 48 ¶ 9; Dkt. No. 40-1 ¶ 26; Dkt. No. 38-4. It stated:

> This is a temporary suspension while the circumstances surrounding the following incident(s) are investigated:
>
> The facts and circumstances surrounding your arrest for Reckless Endangerment 2, Reckless Driving, Unauthorized Use of Colored Lights, Unauthorized Use of Amber Lights, License Plate Violation, Failure to Obey a Traffic Device, Failure to Yield the Right of Way to an Emergency Vehicle, Collide with an Emergency Vehicle and Imprudent Speed on 7/8/21 in the confines of the 70 Precinct.

Dkt. No. 38-4.

The Notice of Determination advised Plaintiff of his rights. He could request a hearing-by-mail to obtain restoration of his license during the pendency of the License Division's investigation by submitting a signed, notarized statement to the Commanding Officer of the License Division providing support for his request. *Id.* After a complete investigation, the Commanding Officer would issue a final determination regarding the status of Plaintiff's license. *Id.* During the investigation, Plaintiff would have the opportunity to provide his version of the events or an explanation. *Id.* Upon completion of the investigation, Plaintiff would have an additional thirty days to request a hearing before a Hearing Officer to contest an adverse determination. *Id.*

Plaintiff never asked for a hearing-by-mail to request restoration of his license. Dkt. No. 48 ¶ 10; Dkt. No. 40-1 ¶ 28.

Plaintiff surrendered his Heckler and Koch 9mm pistol, which was associated with his Premises Residence Handgun License, to the NYPD for safekeeping on July 12, 2021. Dkt. No. 48 ¶ 12; Dkt. No. 40-1 ¶ 30; Dkt. No. 38-5. Plaintiff's firearm remains in NYPD custody. Dkt. No. 48 ¶ 13; Dkt. No. 40-1 ¶ 31.

On April 15, 2022, Plaintiff's charges were dismissed by adjournment in contemplation of dismissal in Kings County Criminal Court. Dkt. No. 40-1 ¶ 20; Dkt. No. 38-6. On May 3, 2022, Plaintiff emailed Officer Perrone the certificate of disposition regarding his criminal charges. Dkt. No. 40-1 ¶ 32. On May 9, 2022, Officer Perrone responded to Plaintiff's email and asked him to send her a written statement regarding the events leading up to his arrest. *Id.* ¶ 33. On June 1, 2022, Plaintiff emailed Officer Perrone the following written explanation of the events surrounding his arrest:

> I was driving with lights and sirens to urgently deliver food to a cancer patient as part of my volunteer work with **Chai4Ever**, an organization that provides food to **Cancer & Seriously ill patients**. While doing this, I was struck by an NYPD vehicle that also had emergency lights and sirens. As a result of this accident, I suffered serious injuries, was hospitalized and arrested. Dashcam footage that I have of the incident clearly shows that I had the right of way at the time of the accident.

*Id.* ¶ 34; Dkt. No. 47-11. Following Officer Perrone's investigation, she recommended that Plaintiff's license be revoked. The Case Supervisor, Section Commander, and Commanding Officer all concurred with Officer Perrone's recommendation. Dkt. No. 40-1 ¶ 35; Dkt. No. 38-7.

By Notice of Determination dated July 8, 2022, the License Division informed Plaintiff that his Premises Residence Handgun License was revoked. Dkt. No. 40-1 ¶ 36; Dkt. No. 48 ¶ 14. The Notice of Determination advised that the revocation was due to:

> The facts and circumstances surrounding your arrest for Reckless Endangerment 2, Reckless Driving, Equipment Violation, Unauthorized Use of Colored Lights on Vehicle, Improper Use of Amber Light, License Plate Violation, Failure to Obey a Traffic Device: Red Light, Failure to Yield Right of Way to an Emergency Vehicle, Collide with an Emergency Vehicle and Speeding on 7/8/21.

Dkt. No. 38-8. Plaintiff was advised of his right to request a hearing to challenge the determination. *Id.*

Plaintiff appealed the determination, and an administrative hearing was held before Hearing Officer Scott Rosenberg on August 24, 2022, and November 9, 2022. Dkt. No. 40-1 ¶ 37. Ahead of the hearing, Plaintiff provided the License Division with dashcam footage and intersection footage captured by an unknown individual but provided to Plaintiff by his friend Avi Rosenfeld. *Id.* ¶ 38. At the August 24, 2022 hearing, Plaintiff testified that he overtook vehicles stopped at a red light because he needed to "get the food urgently" to a "[s]eriously ill patient," and that he had emergency lights and sirens on when he reached Foster Avenue. *Id.* ¶ 39. At the November 9, 2022 hearing, Officer Justin Stewart, who was driving the police vehicle involved in the collision, testified that at the time of the incident, he was driving eastbound down Foster Avenue in response to an emergency. *Id.* ¶ 39.

Hearing Officer Rosenberg prepared a report, dated November 29, 2022, summarizing the administrative hearing and recommending that Plaintiff's license remain revoked. *Id.* ¶ 40; Dkt. No. 47-16.[4] The hearing officer concluded that Plaintiff lacked the "essential temperament or character" needed to possess a handgun. Dkt. No. 47-16 at 10. He determined that Plaintiff's conduct on July 8, 2021 constituted reckless endangerment in the second degree. *Id.* at 10–11. The report stated that Plaintiff unlawfully activated the emergency lights and siren on his Ford Explorer while traveling at an excessive rate of speed on Coney Island Avenue, and then crossed over a double yellow line to get around other vehicles, proceeded through the turning lane's red light into the intersection, and hit Police Officer Stewart's police car, which had its emergency lights and siren activated, causing Plaintiff's vehicle to strike and knock over a traffic light pole and causing the police car to hit a third vehicle. *Id.* The hearing officer concluded that the

[4] Citations to this docket entry use ECF pagination.

evidence established that Plaintiff's "actions were reckless and created a substantial risk of serious physical injury to another person." *Id.* at 11.

The hearing officer also concluded that Plaintiff's conduct constituted reckless driving, the failure to yield to an emergency vehicle, the failure to stop at a red light, and driving at an excessive rate of speed. *Id.* at 11–13. The hearing officer acknowledged Plaintiff's claim that he did not see the police car or hear its siren, but concluded that this was "arguably because [Plaintiff] activated his unauthorized siren when he travelled, at an excessive rate of speed, into the intersection." *Id.* at 11–12. The report also found that "due to [Plaintiff's] excessive rate of speed, he did not observe Police Officer Stewart's police car, which had its emergency lights and siren activated." *Id.* at 12–13.

The hearing officer further concluded that Plaintiff violated New York Vehicle and Traffic Law § 402(1)(a) with respect to the display of license plates and Vehicle and Traffic Law § 375(41) prohibiting the use of emergency lights by a vehicle other than an authorized emergency vehicle. *Id.* at 13. The officer found insufficient evidence that Plaintiff violated Vehicle and Traffic Law § 1144-a (which requires operators of motor vehicles to avoid colliding with a stopped emergency vehicle) because Officer Stewart's vehicle was not stopped at the time of the collision, and insufficient evidence that Plaintiff violated the Vehicle and Traffic Laws prohibiting the improper use of amber lights and tinted windows. *Id.* at 12–14.

In summary, the hearing officer concluded:

> Licensee drove recklessly on a busy street, and thereby endangered the lives and safety of the people that were in the area. Licensee's reckless driving resulted in a police officer sustaining injuries after his SUV slammed into Police Officer Stewart's vehicle. Licensee's reckless conduct raises concerns regarding his ability to safely possess a firearm. It also casts doubt on Licensee's fitness to possess a firearm as well as on his character.

> In addition to driving recklessly, Licensee committed multiple Vehicle and Traffic Law offenses. These offenses reflect poorly on his ability to comply with the law and rules, including laws and rules related to the possession of a licensed firearm.

*Id.* at 14.

On December 27, 2022, the License Division issued a Final Agency Determination stating that after the administrative hearing, Plaintiff's Premises Residence Handgun License remained revoked, enclosing a copy of the hearing report, and advising Plaintiff of his right to commence an Article 78 proceeding in New York State Supreme Court. *Id.* at 5; Dkt. No. 40-1 ¶ 41.

## PROCEDURAL HISTORY

Plaintiff commenced this case by complaint filed on April 5, 2024. Dkt. No. 1. The complaint seeks a declaratory judgment that Defendants' termination of Plaintiff's right to possess handguns in his home for self-defense violated his Second Amendment rights, a declaration that 38 RCNY § 5-11 is unconstitutional as applied to him, a declaration that 38 RCNY § 5-30(c)(1)[5] is facially unconstitutional and unconstitutional as applied to him, and a permanent injunction against Defendants' enforcement of 38 RCNY § 5-30(c)(1). *Id.* ¶ 1 & pp. 7–8 (Prayer for Relief).

On June 28, 2024, Defendants filed an answer to the complaint and asserted various affirmative defenses. Dkt. No. 10. Following the close of discovery, which included

---

[5] Although the first paragraph of the complaint refers to 38 RCNY § 5-30(b)(1), the complaint does not mention that provision again. It instead focuses on the language of § 5-30(c)(1), and it is that provision's enforcement that Plaintiff seeks to permanently enjoin. *See* Compl. ¶¶ 21, 38, 43 & p. 8. Nor would a challenge to § 5-30(b)(1) make sense in the context of Plaintiff's allegations. That provision requires only that a lost handgun be "immediately reported to the 'Precinct of Occurrence' and the License Division Incident Section." 38 RCNY § 5-30(b)(1). The Court therefore assumes that Plaintiff's challenge was directed at 38 RCNY § 5-30(c)(1) and that the initial reference to § 5-30(b)(1) was erroneous.

interrogatories, document demands, requests for admission, and the deposition of Plaintiff, the parties cross-moved for summary judgment.

On January 13, 2026, Plaintiff filed his motion for summary judgment, supported by a memorandum of law, Plaintiff's Rule 56.1 statement as well as a joint Rule 56.1 statement, and the declarations of Plaintiff and Amy L. Bellantoni, attaching exhibits. Dkt. Nos. 37–41.

Defendants filed their cross-motion for summary judgment on February 17, 2026, supported by a memorandum of law, Rule 56.1 statement, a counterstatement to Plaintiff's Rule 56.1 statement, and the declarations of Nicole Berkovich and Nicholas R. Ciappetta, attaching exhibits. Dkt. Nos. 44–49.

On March 10, 2026, Plaintiff filed a memorandum of law in opposition to Defendants' cross-motion for summary judgment and in further support of his motion for summary judgment, as well as a counterstatement to Defendants' Rule 56.1 statement. Dkt. Nos. 50–51.

On March 24, 2026, Defendants filed a reply memorandum of law in further support of their cross-motion for summary judgment. Dkt. No. 52.

The parties filed letters regarding supplemental authorities on April 1, 2026, July 1, 2026, and July 13, 2026. Dkt. Nos. 53–55.

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Id.* at 114 (quoting *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69, 73 (2d Cir. 2016).

"If, as here, 'both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it.'" *Envy Branding, LLC v. William Gerard Grp., LLC*, 2024 WL 869156, at *7 (S.D.N.Y. Feb. 29, 2024) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein*, 996 F.2d at 1461; *accord Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121.

## II. The Second Amendment

"The Second Amendment protects the right of 'all Americans' to keep and bear firearms for self-defense." *United States v. Hemani*, 608 U.S. 772, 779 (2026) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)). To determine whether a regulation violates the Second Amendment, the Court first asks "whether the Amendment's terms cover the conduct in question." *Id.* at 780 (citing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)). "If so, the Constitution 'presumptively' protects it. To overcome that presumption, the government then bears the burden of showing its regulatory efforts are 'consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24). "[T]o show that a contemporary regulation is consistent with this Nation's historical tradition of firearm regulation, [courts] do not require the government to point to a 'historical twin' or

'precis[e] . . . historical precursors.'" *Id.* (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)). Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. "[T]o that end, the government may 'reaso[n] by analogy,' showing that its contemporary regulation is 'relevantly similar' to ones 'well-established' in the Nation's history." *Hemani*, 608 U.S. at 780 (quoting *Bruen*, 597 U.S. at 28–30).

Two features play a central role in determining whether modern regulations are "relevantly similar" to historical ones: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29; *see id.* ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." (quoting *McDonald v. Chicago*, 561 U.S. 742, 767 (2010))). "The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld. Conversely, the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review." *Hemani*, 608 U.S. at 780–81.

## III. Facial and As-Applied Challenges

"To mount a successful facial challenge, the plaintiff 'must establish that no set of circumstances exists under which the [law] would be valid, or show that the law lacks 'a plainly legitimate sweep.'" *Antonyuk v. James*, 120 F.4th 941, 983 (2d Cir. 2024) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)), *cert. denied*, 145 S. Ct. 1900 (2025). As the Second Circuit reiterated in *Antonyuk*, "'[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.'" *Id.* (quoting *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019)). For that reason, facial challenges are the "most difficult challenge to

mount successfully." *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "[T]o prevail, the Government need only demonstrate that [the law] is constitutional in some of its applications." *Id.*

An as-applied challenge "requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006). "Factual context and [the] defendant's circumstances are critical." *United States v. Laurent*, 861 F. Supp. 2d 71, 93 (E.D.N.Y. 2011). "[A] plaintiff generally cannot prevail . . . without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally applied to him." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014).

**DISCUSSION**

Plaintiff's claims have shifted over the course of this litigation. In his opening brief, Plaintiff challenged 38 RCNY § 5-11 "both facially (through the enforcement of § 5-10(n)) and as applied." Dkt. No. 41 at 4; *see id.* at 1, 7–9. His memorandum of law in opposition to Defendants' cross-motion for summary judgment and in further support of his motion recasts the challenge: Plaintiff now contends that § 5-11 is unconstitutional as applied to him, and that § 5-10(n) is unconstitutional both facially and as applied. Dkt. No. 50 at 1 n.1, 2. He further states that "[b]ecause the record reflects no reliance on Rule 5-30(c)(1) as a basis for the revocation, that Rule is not the subject of this challenge." *Id.* at 1 n.1.[6,7]

---

[6] Section 5-30(c)(1) requires a licensee to report immediately to the License Division any arrest, indictment, or conviction in any jurisdiction. Even if Plaintiff had not abandoned his challenge to the rule, he would lack standing to pursue it. The License Division did not suspend or revoke Plaintiff's license for failing to comply with that reporting requirement, *see* Dkt. Nos. 38-4, 38-8, 47-16, and Plaintiff identifies no other way in which the rule has injured him. *See* Dkt. No. 41 at 9 n.3 (conceding that § 5-30 "is inapplicable to the facts of this case"); Dkt. No. 49 at 13–14.

[7] The complaint does not mention § 5-10(n), "good moral character," or the License Division's discretion. It challenges § 5-11 as applied and § 5-30(c)(1) facially and as applied, on the theory

The challenges to § 5-11 and § 5-10(n) are, in substance, a single challenge. Section 5-11 authorizes the License Division to suspend or revoke a handgun license "upon evidence of any disqualification pursuant to this chapter." 38 RCNY § 5-11. Plaintiff identifies § 5-10(n) as the disqualification applied to him, Dkt. No. 50 at 1 n.1, and he does not contend that § 5-11 is unconstitutional apart from its incorporation of § 5-10(n).[8] Plaintiff's claims therefore reduce to a challenge to § 5-10(n), which, through § 5-11, permits the License Division to revoke a license upon a finding that "[o]ther information" demonstrates "an unwillingness to abide by the law,"

---

that Plaintiff was disarmed based on charges that were "terminated in his favor, dismissed, and sealed." Compl. ¶¶ 17–18, 41, 43. "Under Fed. R. Civ. P. 15(b), a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569–70 (2d Cir. 2000) (Sotomayor, J.) (applying Fed. R. Civ. P. 15(b)(2) at the summary judgment stage to consider claims not expressly raised in the complaint); *see Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, 2025 WL 2781280, at *17 (S.D.N.Y. Sept. 30, 2025) (at summary judgment, deeming complaint to be effectively amended to include a challenge to eligibility criteria because criteria had become a focus of the litigation). Because Defendants have addressed Plaintiff's challenge to § 5-10(n) on the merits, the Court does so as well.

[8] Defendants suggest that § 5-10(n) is not properly challenged because the License Division did not cite it. Dkt. No. 49 at 8–9 & n.3; Dkt. No. 52 at 3 n.2. The notices of suspension and revocation, the Final Agency Determination, and the hearing officer's report do not cite a specific subsection of § 5-10. They state only that the License Division acted on "[t]he facts and circumstances surrounding [Plaintiff's] arrest." Dkt. No. 38-4 at 2; Dkt. No. 38-8 at 2; Dkt. No. 47-16 at 14. But traceability turns on whether the challenged rule played a role in the injury, not on whether the agency cited it by number. *See Antonyuk*, 120 F.4th at 978 (plaintiff's injury was "traceable to the character requirement itself, even if he [was] *directly* deterred only by the disclosure requirements," because the two were "inextricable"). The record ties the revocation to the grounds set out in § 5-10(n). The hearing officer, whose recommendation the Director of the NYPD License Division adopted, concluded that Plaintiff "endangered the lives and safety of the people that were in the area" and that his offenses "reflect poorly on his ability to comply with the law and rules," Dkt. No. 47-16 at 14, language that tracks § 5-10(n)'s references to "a lack of concern for the safety of . . . other persons and/or for public safety" and "an unwillingness to abide by the law." And the Director attests that the revocation rested on "an unwillingness to abide by the law, a lack of candor toward law enforcement, and a lack of concern for the safety for himself and others." Dkt. No. 48 ¶ 21. That the License Division might also have relied on § 5-10(a), *see* Dkt. No. 52 at 3 n.2, does not mean the revocation is not traceable to § 5-10(n). The record is therefore sufficient to establish, for purposes of standing, that Plaintiff's injury is fairly traceable to § 5-10(n).

"a lack of candor towards lawful authorities," or "a lack of concern for the safety of oneself and/or other persons and/or for public safety." 38 RCNY § 5-10(n).[9]

Plaintiff's briefing does not clearly separate his facial and as-applied arguments. Instead, he advances the same core contention in support of both challenges: that § 5-10(n) unconstitutionally permits disarmament without a criminal conviction, without a finding of violence or firearm misuse, and without a court adjudication of dangerousness. In support of his facial challenge, Plaintiff seems to suggest that the rule is invalid in all applications because it authorizes an administrative officer to disarm in the absence of those predicates. *See* Dkt. No. 41 at 7–9; Dkt. No. 50 at 7–8, 11–14. And in support of his as-applied challenge, he argues that his revocation was unconstitutional because it was imposed on "an individual with no criminal

[9] The License Division revoked Plaintiff's license on July 8, 2022, and the hearing officer issued his report on November 29, 2022, both under the version of Chapter 5 in effect before the NYPD amended § 5-10 effective December 16, 2022. *See* Dkt. No. 48 ¶ 6; Dkt. No. 48-1; Dkt. No. 38-8 at 2; Dkt. No. 47-16 at 15. The Director's December 27, 2022 Final Agency Determination adopted the hearing officer's report without further reasoning. Dkt. No. 47-16 at 15. The as-applied challenge is therefore assessed under the prior version of § 5-10(n), which permitted denial where "[o]ther information demonstrates an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or other good cause for the denial of the license." Dkt. No. 48-1 at 14–15. Because Plaintiff seeks a declaration of facial invalidity, and because both parties address his facial challenge to the current text, *see* Dkt. No. 41 at 7; Dkt. No. 49 at 6, 9–10; Dkt. No. 50 at 19–20, the Court analyzes that challenge under the current version, which permits denial based on "[o]ther information that demonstrates the lack of good moral character, including but not limited to an unwillingness to abide by the law, a lack of candor towards lawful authorities, a lack of concern for the safety of oneself and/or other persons and/or for public safety, and/or an inability to maintain handgun possession in a manner that is safe to oneself or others." 38 RCNY § 5-10(n). The amendment thus made two relevant changes: it introduced the list of grounds in § 5-10(n) with a reference to "the lack of good moral character," and it replaced "other good cause for the denial of the license" with "an inability to maintain handgun possession in a manner that is safe to oneself or others." Both versions permit denial based on "an unwillingness to abide by the law," "a lack of candor towards lawful authorities," and "a lack of concern for the safety of oneself and/or other persons and/or for public safety," the three grounds on which Plaintiff contends he was disarmed. *See* Dkt. No. 50 at 20 (citing Dkt. No. 48 ¶ 21).

conviction, no history of firearm misuse, and no court finding of dangerousness" by "an administrative officer exercising unbounded discretion." Dkt. No. 50 at 20. His arguments about the disposition of his criminal charges make the same point: because the charges were resolved by an adjournment in contemplation of dismissal, "[n]o court ever found Plaintiff dangerous." *Id.* at 17; *see id.* at 15–17.

These arguments attack features of the rule's text that are present in every application; they do not become as-applied arguments because Plaintiff pairs them with the facts of his own revocation. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (because plaintiffs' claim and the relief that would follow "reach beyond the particular circumstances of these plaintiffs," they "must therefore satisfy [the] standards for a facial challenge to the extent of that reach"). The Court therefore addresses them under the standard governing facial challenges. What remains for the as-applied analysis is the question *Antonyuk* preserved for such challenges: whether the License Division, in revoking Plaintiff's license, relied on "impermissible reasons untethered to dangerousness," 120 F.4th at 986, or on "flimsy imputations, unsupported subjective intuitions, or hunches about the applicant's character," *id.* at 999, rather than on a reasoned determination, supported by evidence, that Plaintiff would pose a danger if armed.

## I. Plaintiff's Facial Challenge to 38 RCNY § 5-10(n)

To succeed on his facial challenge, Plaintiff must show that § 5-10(n) is unconstitutional in all of its applications. *See Antonyuk*, 120 F.4th at 983.[10] In assessing whether § 5-10(n) is

---

[10] Plaintiff contends in reply that this standard does not apply because § 5-10(n) is an administrative rule rather than a legislative act. Dkt. No. 50 at 18–19. But the Supreme Court has applied the same standard to a facial challenge to an agency regulation, *see Reno v. Flores*, 507 U.S. 292, 301 (1993), and courts in this District have applied it to facial challenges to Title 38 of the RCNY, including to § 5-10 itself, *see Abekassis v. New York City*, 477 F. Supp. 3d 139, 156 (S.D.N.Y. 2020), *judgment vacated*, *appeal dismissed*, 2021 WL 852081 (2d Cir. Mar. 4, 2021); *Mills v. New York City*, 758 F. Supp. 3d 250, 263 (S.D.N.Y. 2024). Plaintiff argues in the alternative that, even if the standard applies, "[a] single permissible application cannot redeem" a

consistent with the Nation's historical tradition, "[w]hy and how the regulation burdens the right are central to th[e] inquiry." *Rahimi*, 602 U.S. at 692. Plaintiff does not dispute that the government may disarm persons who would pose a danger if armed, and he acknowledges that *Antonyuk* construed New York's good-moral-character standard as "a 'proxy for dangerousness.'" Dkt. No. 41 at 7 (quoting *Antonyuk*, 120 F.4th at 981). His challenge is principally to the "how": the mechanism by which § 5-10(n) identifies dangerous persons, and the evidence on which the License Division may rely. *Antonyuk* forecloses that challenge. As explained below, § 5-10(n) implements the same character standard *Antonyuk* upheld; the discretion it confers on licensing officials is consistent with the Nation's tradition of firearm regulation; and that tradition does not require a conviction, prior misuse of a firearm, or interpersonal violence before a person may be disarmed. Because § 5-10(n) therefore has constitutional applications, Plaintiff's facial challenge fails.

**A. Character as a Proxy for Dangerousness**

In *Antonyuk*, the Second Circuit rejected a facial challenge to the requirement in New York's Concealed Carry Improvement Act ("CCIA") that a concealed-carry applicant be of "good moral character," defined as "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." N.Y. Penal L. § 400.00(1)(b); *see Antonyuk*, 120 F.4th at 980–87. The court held that "[t]he CCIA's definition of 'character' is a proxy for dangerousness: whether the applicant, if licensed to carry a firearm, is likely to pose a danger to himself, others, or public safety." *Id.* at 981. And because "'[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing

---

rule whose defect is "structural." Dkt. No. 50 at 19. But a rule with a constitutional application is not invalid on its face, however its defect is described.

firearms,'" the court could not "conclude that *every* denial on grounds of 'good moral character' as defined by New York will violate the Second Amendment." *Id.* (quoting *Rahimi*, 602 U.S. at 690). "The gravamen of the 'character' inquiry is whether the applicant can 'be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others,'" and the denial of a license on that basis "would clearly fall within the historical tradition of preventing dangerous individuals from carrying guns." *Id.* at 985 (quoting N.Y. Penal L. § 400.00(1)(b)). A "reasoned denial of a carry license to a person who, if armed, would pose a danger to themselves, others, or to the public is consistent with the well-recognized historical tradition of preventing dangerous individuals from possessing weapons." *Id.* at 976; *see also Giambalvo v. Suffolk Cnty.*, 155 F.4th 163, 178 (2d Cir. 2025) (determining plaintiffs could not show a likelihood of success in their facial challenges to multiple parts of New York's license application requirements).

That reasoning applies with equal force to § 5-10(n). Section 5-10 permits denial where an applicant "lacks good moral character," 38 RCNY § 5-10, a standard the rules define in the same terms as the Penal Law, *id.* § 5-02(a). Section 5-10(n) does not create a separate standard; it identifies one category of evidence relevant to that determination: "[o]ther information that demonstrates the lack of good moral character." *Id.* § 5-10(n). Because § 5-10(n) operates only through the good-moral-character standard, it is, like the standard *Antonyuk* upheld, "a proxy for dangerousness." *See* 120 F.4th at 981.

That *Antonyuk* addressed the issuance of a license, and this case its revocation, makes no difference. Under § 5-11, the License Division may revoke a handgun license only "upon evidence of any disqualification pursuant to this chapter," *id.* § 5-11, so revocation turns on the same inquiry as issuance—whether the licensee can be entrusted with a firearm without

endangering himself or others. The "why" is identical in both settings, and so are the historical analogues that justify it. Indeed, the surety laws on which *Antonyuk* and *Rahimi* relied, which "empowered magistrates to require those individuals '[of] whom there is a probable ground to suspect of future misbehaviour' to post a bond as a condition for firearm possession," operated on persons who already possessed arms. *Antonyuk*, 120 F.4th at 985 n.33 (quoting *Rahimi*, 602 U.S. at 695); *see id.* at 998.

**B. Discretionary Determinations by Licensing Officials**

Plaintiff's challenge to the "how" of § 5-10(n) begins with the discretion it confers and the officials who exercise it. He argues that the rule gives administrative officials "unbounded discretion" to disarm on the basis of "an undefined and limitless array of generalities," and that any finding of dangerousness must be made by a court rather than a licensing officer. Dkt. No. 41 at 7–8; Dkt. No. 50 at 11–13, 18–20. *Antonyuk* rejected both contentions.

As to discretion, the Second Circuit held that "[f]or as long as licensing has been used to regulate privately-owned firearms, issuance has been based on discretionary judgments by local officials," and that "[l]icensing that includes discretion that is bounded by defined standards . . . is part of this Nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment." *Antonyuk*, 120 F.4th at 981. "[L]icensing statutes that require 'good moral character,' defined in terms of a person's ability to carry weapons without creating danger to themselves or others based on whether they are law-abiding persons, are permissible, even if they inevitably rely on the judgment of the licensing authorities in determining whether that criterion has been met." *Id.* at 987. The court also rejected the argument that *Bruen* forbids such discretion, observing that the Supreme Court in *Bruen* approved "shall-issue" regimes that call for discretionary judgments, such as whether an applicant "causes justifiable concern for

public safety" or "is likely to use a weapon unlawfully." *Id.* at 995 (citations omitted); *see id.* at 981, 994–97.

As to the decisionmaker, the historical regimes on which *Antonyuk* relied vested these judgments in local officials, not courts. New York City's 1878 ordinance, for example, permitted a precinct commander to recommend a permit "if satisfied that the applicant is a proper and law-abiding person." *Id.* at 988–89 (quoting 1878 New York Ordinance § 2); *see also Frey*, 157 F.4th at 141 (recognizing a "strong historical tradition of allowing localities to implement their own, often stricter, regulatory measures within their jurisdictions"). And the court found the licensing officer's determination under the CCIA's good-moral-character requirement, "subject to administrative appeals and judicial review," to be "no less precise than the 'probable ground to suspect . . . future misbehavior' standard of the surety laws." *Antonyuk*, 140 F.4th at 998. What mattered in *Rahimi*, the court explained, was "the *substance* of the regulation, rather than the *form*": the surety and going-armed laws "used their differing procedural mechanisms to disarm those who were determined to be dangerous." *Id.* at 997–98.

Section 5-10 operates within those bounds. As explained *supra*, it applies the same good-moral-character requirement as the Penal Law, *see* 38 RCNY §§ 5-02(a), 5-10; N.Y. Penal L. § 400.00(1)(b), and its enumerated factors, including § 5-10(n), do not mandate denial or revocation on any ground. They identify categories of information that guide the License Division's assessment of whether an applicant or licensee "lacks good moral character." 38 RCNY § 5-10; *see* Dkt. No. 48 ¶ 18 (the § 5-10 factors "are indicators that an individual may not be able to safely possess firearms, but they are not categorical disqualifiers"). The rule also requires the License Division to "consider all relevant factors, including but not limited to the number, recency and severity of incidents and the outcome of any judicial or administrative

proceedings." 38 RCNY § 5-10; *see* Dkt. No. 48 ¶ 19. And a licensee whose license is revoked is entitled to a hearing, 38 RCNY § 15-22, and to judicial review under Article 78 of the New York Civil Practice Law and Rules, Dkt. No. 47-16 at 5; *see Antonyuk*, 120 F.4th at 986.

Plaintiff singles out three of the grounds listed in § 5-10(n)—"unwillingness to abide by the law," "lack of candor towards lawful authorities," and "lack of concern for the safety of oneself and/or other persons and/or for public safety"—and argues that, unlike the Penal Law standard *Antonyuk* construed as "a proxy for dangerousness," § 5-10(n) "admits of no such limiting construction," Dkt. No. 50 at 19–20. But no separate construction is needed. Section 5-10(n) does not authorize denial on any of these grounds standing alone; it identifies "[o]ther information that demonstrates the lack of good moral character," 38 RCNY § 5-10(n), a term defined, as in the Penal Law, as "the essential character, temperament and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or another," *id.* § 5-02(a). The listed grounds in § 5-10(n) are thus relevant only insofar as they demonstrate a lack of good moral character so defined. And at least one of them—a "lack of concern for the safety of oneself and/or other persons and/or for public safety"—describes precisely the kind of determination *Antonyuk* placed within the "heartland" of a constitutional character inquiry. *See* 120 F.4th at 985, 1001; *see also Flaifel v. City of New York*, 2026 WL 866816, at *5 (S.D.N.Y. Mar. 30, 2026) (noting that § 5-10(n) "seem[s] rationally tied to dangerousness and share[s] similarities with laws the Second Circuit has held are likely constitutional").[11] Whether a particular determination resting on another ground is "untethered

[11] The Court need not and does not decide whether each ground listed in § 5-10(n) could independently support a denial or revocation. Still, the remaining grounds also appear to bear on the question the good-moral-character standard poses. A licensee's "unwillingness to abide by the law" may inform whether he can be trusted to comply with the laws governing the storage, carriage, and use of a firearm. *Antonyuk* described permissible character standards as those

to dangerousness" is a question for as-applied review, not a basis for invalidating the rule on its face. *See Antonyuk*, 140 F.4th at 986.

**C. The Absence of a Conviction, Firearm Misuse, or Violence**

Plaintiff's remaining arguments ask the Court to go further still. He contends that § 5-10(n) is facially invalid because it permits disarmament without a criminal conviction or court adjudication of dangerousness, without a finding that the licensee misused a firearm, and without a finding that the licensee engaged in interpersonal violence. Dkt. No. 50 at 7–8, 11–17. But what the Second Amendment permits, as *Antonyuk* explains, is the denial of a license "based on a reasoned determination that the applicant, if permitted to wield a lethal weapon, would pose a danger to himself, to others, or to public safety." 120 F.4th at 983. Neither that standard nor the tradition underlying it makes disarmament contingent on the additional predicates Plaintiff proposes.

First, the historical tradition on which *Antonyuk* and *Rahimi* relied does not require a conviction before disarmament. The magistrates who administered the surety laws "had considerable discretion . . . to apply a broad general standard of future risk in order to deny to certain persons a right otherwise attaching to law-abiding persons." *Antonyuk*, 120 F.4th at 998. The Second Circuit accordingly rejected the argument that *Bruen* forbids disarmament based on "[p]remonitions of [d]angerousness" or on officials' judgments about "whether an individual is likely to pose a danger to society in the future," because *Rahimi* "relied on historical precedents

---

"defined in terms of a person's ability to carry weapons without creating danger to themselves or others based on whether they are law-abiding persons." 120 F.4th at 987; *see id.* at 989 (1878 New York City ordinance conditioning permits on whether "the applicant is a proper and law-abiding person"). And a licensee's "lack of candor toward lawful authorities" may bear on the same question in a licensing scheme that depends on licensees' truthful disclosure of incidents and changes in circumstances. *See* 38 RCNY § 5-30; *Antonyuk*, 120 F.4th at 1001 ("It must therefore be constitutional for the licensing authority to investigate the applicant's character . . . .").

involving such forward-looking determinations—the surety laws." *Id.* at 985 n.33. The tradition thus does not require the License Division to wait until a person's dangerousness has culminated in a criminal conviction before acting. Nor does it require an individualized *judicial* finding of dangerousness. The character standard *Antonyuk* upheld is applied by licensing officers, not courts, *see id.* at 981, 987, 998, and the Second Circuit has upheld categorical disarmament without any individualized finding of dangerousness at all, *see Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025). Plaintiff's reliance on the disposition of his criminal charges fails for the same reason. His contention that "[n]o court ever found Plaintiff dangerous," Dkt. No. 50 at 17, assumes that the Second Amendment requires such a finding, and it does not.

Nor does the tradition limit disarmament to persons who have misused a firearm. The Supreme Court in *Rahimi* upheld 18 U.S.C. § 922(g)(8), which disarms individuals subject to a domestic-violence restraining order that finds they "represent[] a credible threat to the physical safety" of an intimate partner or child, 602 U.S. at 684–85 (quoting § 922(g)(8)(C)(i)), because "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others," *id.* at 693.[12] The Second Amendment does not require a licensing authority to wait until a firearm has been misused before denying an individual the right to possess the firearm or revoking a license once granted. Here, the statute turns on the threat an individual poses, not on whether he has misused a firearm. *Antonyuk*, too, placed within the

[12] Plaintiff also draws attention to the fact that *Rahimi* involved only temporary disarmament. Dkt. No. 50 at 7, 12. He does not, however, go so far as to suggest that revocation under § 5-10(n) is unconstitutional because it is permanent, and the premise would be doubtful in any event. Under the current rules, a prior revocation is disqualifying only if it was ordered under N.Y. Crim. Proc. Law § 530.14 or N.Y. Fam. Ct. Act § 842-a. *See* 38 RCNY § 5-02(d). Plaintiff identifies no provision that would disable him from re-applying for a license and attempting to demonstrate that based on all relevant facts, including his conduct since the license was revoked, he should be permitted to possess a handgun.

"heartland" of the character inquiry the denial of a license to someone who refuses "to take safety precautions," 120 F.4th at 985, or who will not "secure firearms from meddling" by children, *id.* at 1001. And the Second Circuit has upheld the disarmament of individuals convicted of nonviolent felonies unrelated to firearm use. *See Zherka*, 140 F.4th at 73, 77.[13]

Finally, Plaintiff contends that the tradition reaches only those who threaten "interpersonal violence." Dkt. No. 50 at 13–14. Plaintiff does not define "interpersonal violence," and neither *Antonyuk* nor *Rahimi* adopted it as a limit on the tradition. *Antonyuk* described the inquiry as whether the applicant "is likely to pose a danger to himself, others, or public safety." 120 F.4th at 981. And *Rahimi* spoke of individuals who "threaten physical harm to others" and who "pose a credible threat to the physical safety of others," 602 U.S. at 690, 693, language that does not require that the threat be intentional. Conduct that creates a substantial risk of serious physical injury to others threatens their physical safety, whether or not it is characterized as "interpersonal violence." Danger to oneself, moreover, is not interpersonal violence at all, and the examples *Antonyuk* gave (refusing to take safety precautions or failing to secure firearms from children) involve none. 120 F.4th at 985, 1001. The court likewise credited historical intoxicated-persons statutes, which were "motivated by the need to disarm intoxicated individuals who could not be trusted with weapons," whether or not they had threatened anyone. *Id.* at 1031; *see id.* at 1029–30. And courts have recognized that a person

[13] Plaintiff's rule would also invert the purpose of licensing. Because a license is required to possess a handgun in New York, an applicant ordinarily could not have misused a firearm without first possessing one unlawfully. On Plaintiff's view, then, a licensing officer would be required to issue a license to an applicant who had shown through other conduct that he could not be trusted with a deadly weapon, and then could revoke it only after the applicant misused the firearm—that is, only after the harm licensing exists to prevent. That would nullify the very discretion *Antonyuk* upheld: the authority to deny a license to a person who cannot "be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." 140 F.4th at 985 (quoting N.Y. Penal L. § 400.00(1)(b)).

may demonstrate dangerousness through the operation of a motor vehicle. *See Flaifel*, 2026 WL 866816, at *5 ("[I]t is easy to imagine instances where, through their driving history, an individual has shown himself or herself to be a person who is 'dangerous to others.'" (quoting *Antonyuk*, 120 F.4th at 971)); *United States v. Betancourt*, 139 F.4th 480, 484 (5th Cir. 2025) ("As described above, Betancourt disregarded a flashing red light while driving at his vehicle's maximum speed, 107 miles per hour, causing a major crash and serious injuries to two people. He accordingly 'poses a threat to public safety.'" (quoting *United States v. Schnur*, 132 F.4th 863, 870 (5th Cir. 2025))), *cert. denied*, 223 L. Ed. 2d 561 (Jan. 20, 2026).

Section 5-10(n) thus has obvious constitutional applications. It reaches, for example, a licensee who demonstrates "a lack of concern for the safety of oneself and/or other persons and/or for public safety" or "an inability to maintain handgun possession in a manner that is safe to oneself or others." 38 RCNY § 5-10(n). Denying or revoking a license on either ground falls squarely within the tradition of "preventing dangerous individuals from carrying guns." *Antonyuk*, 120 F.4th at 985. Plaintiff's contrary theory proves too much. It would require invalidating not only § 5-10(n) but also the Penal Law standard it implements, which likewise requires no conviction, finding of violence, or prior misuse of a firearm, and which *Antonyuk* sustained against a facial challenge.[14] Plaintiff's facial challenge to § 5-10(n) is therefore without merit.

[14] Several provisions of § 5-10 which Plaintiff does not challenge also permit denial without a conviction, a finding of violence, or firearm misuse, including § 5-10(a) (arrests and indictments), § 5-10(c) (a "disability or condition that may affect the ability to safely possess or use a handgun, including but not limited to alcoholism, drug use or mental illness"), and § 5-10(h) (poor driving history). Though Plaintiff's choice not to challenge those provisions is not a concession as to their validity, the rule he proposes cannot be reconciled with them, or with the CCIA standard *Antonyuk* upheld. *See* Dkt. No. 49 at 12 n.6.

## II. Plaintiff's As-Applied Challenge to 38 RCNY §§ 5-10(n) and 5-11

Plaintiff also contends that §§ 5-11 and 5-10(n) are unconstitutional as applied to him. *Antonyuk* preserved such challenges. While holding that New York's character requirement is not facially invalid, the Second Circuit recognized that "various avenues lie open for as-applied challenges." 120 F.4th at 981. "[G]ood moral character," the court acknowledged, "may be seen as a spongy concept susceptible to abuse, but such abuses, should they become manifest, can still be corrected in court as they arise." *Id.* at 986. A notice of denial that "fails to connect th[e] evidence to the applicant's untrustworthiness to carry a gun without endangering the safety of himself or others may well be deemed arbitrary" under Article 78, and an applicant may also pursue "an internal administrative appeal of his denial." *Id.* "[I]f those statutory remedies fail to correct any error, an as-applied challenge could be pursued in federal court." *Id.* In particular, "a licensing decision that uses 'good moral character' as a smokescreen to deny licenses for impermissible reasons untethered to dangerousness, such as the applicant's lifestyle or political preferences, would violate the Constitution by relying on a ground for disarmament for which there is no historical basis." *Id.* As-applied review thus "ensur[es] that individuals are not prevented from carrying a gun on the basis of flimsy imputations, unsupported subjective intuitions, or hunches about the applicant's character." *Id.* at 999.

The question on Plaintiff's as-applied challenge is therefore whether the License Division revoked his license on a ground within the historical tradition—meaning, as discussed *supra*, a reasoned, evidence-based determination that he would pose a danger if armed, rather than one "untethered to dangerousness." *Id.* at 986. In answering that question, the Court does not itself decide whether Plaintiff lacks good moral character or whether he can be entrusted to use a firearm without endangering himself or others, and it does not reweigh the evidence on which the License Division relied. That judgment was for the hearing officer to make, after the hearing

Plaintiff requested. The Second Circuit took a similar approach in *Zherka*, where, in rejecting an as-applied challenge to 18 U.S.C. § 922(g)(1), it did not ask whether the plaintiff himself was dangerous, but whether "how and why" he was disarmed was consistent with the Nation's historical tradition. 140 F.4th at 92. Nor does the inquiry require a historical analogue to the particular conduct on which the License Division relied. The question is whether the revocation "is consistent with the principles that underpin our regulatory tradition," not whether a "historical twin" exists for Plaintiff's reckless driving. *Rahimi*, 602 U.S. at 692 (internal quotation marks omitted).

Plaintiff contends that his license was revoked on grounds that fall outside that tradition. He relies on the declaration of the Director of the NYPD License Division, submitted in the course of this litigation, which states that Plaintiff demonstrated "an unwillingness to abide by the law, a lack of candor toward law enforcement, and a lack of concern for the safety for himself and others." Dkt. No. 48 ¶ 21.[15] Plaintiff argues that these are "open-ended, subjective, individualized character judgments," Dkt. No. 50 at 20, and that his "attitude, remorse, or account of events" cannot justify disarmament, *id.* at 1–2. The record, however, shows that the revocation rested on a reasoned, evidence-based determination of dangerousness.

After the New York State Department of Criminal Justice Services notified the License Division of Plaintiff's July 8, 2021 arrest, the License Division suspended his license pending investigation and investigated the underlying incident. Dkt. No. 48 ¶¶ 7–9; Dkt. No. 38-4; *see* 38 RCNY § 5-30(e). The suspension notice directed Plaintiff to submit a written statement

[15] The Director's declaration describes the grounds for revocation in somewhat different terms than the hearing officer's report, which the Director adopted without elaboration. *Compare* Dkt. No. 48 ¶ 21, *with* Dkt. No. 47-16 at 14–15. In any event, the Court looks to the grounds stated in the decision under review, not to a later characterization of them. *Cf. Antonyuk*, 120 F.4th at 986 (contemplating review of the reasons set out in a written notice of denial).

"explaining the facts and circumstances surrounding [his] incident," Dkt. No. 38-4 at 3, giving him the opportunity to present his account—and he did so, Dkt. No. 47-11. The assigned investigator then reviewed the arrest and complaint reports, the motor vehicle collision report, Plaintiff's written statement, the certificate of disposition, and Plaintiff's driving record, which reflected 22 moving violations. Dkt. Nos. 38-7, 47-10, 47-11. A supervising sergeant separately reviewed body-worn camera footage of the incident, including a witness's statement that Plaintiff "proceeded through the intersection at a red signal causing a collision with the marked [NYPD vehicle]." Dkt. No. 38-7 at 2. The License Division then revoked Plaintiff's license, citing "[t]he facts and circumstances surrounding [his] arrest." Dkt. No. 38-8.

Plaintiff challenged the revocation at an administrative hearing held over two days. Dkt. No. 47-16 at 6. He was represented by counsel, testified to his account of the incident, and introduced evidence, including dashboard-camera and surveillance video of the collision. *Id.* at 6–10. Officer Justin Stewart, whose police car Plaintiff's vehicle struck, testified at Plaintiff's request; he testified that the collision caused him to lose consciousness and that his injuries kept him out of work for approximately six months. *Id.* at 6, 8. The hearing officer then made detailed findings. He found that Plaintiff had driven at an excessive speed with unauthorized emergency lights and a siren activated, crossed a double yellow line, proceeded through a red light from a turning lane, failed to yield to an emergency vehicle, and "slammed into Police Officer Stewart's police car," and that Plaintiff's conduct "created a substantial risk of serious physical injury to another person." *Id.* at 10–13. He also found the evidence to be insufficient on several of the charges against Plaintiff. *Id.* at 12–14. He ultimately concluded the following:

> Licensee drove recklessly on a busy street, and thereby endangered the lives and safety of the people that were in the area. Licensee's reckless driving resulted in a police officer sustaining injuries after his SUV slammed into Police Officer Stewart's vehicle. Licensee's reckless conduct raises concerns regarding his ability

> to safely possess a firearm. It also casts doubt on Licensee's fitness to possess a firearm as well as on his character.
>
> In addition to driving recklessly, Licensee committed multiple Vehicle and Traffic Law offenses. These offenses reflect poorly on his ability to comply with the law and rules, including laws and rules related to the possession of a licensed firearm.

*Id.* at 14. The Director adopted that report as the License Division's final determination. *Id.* at 15.

That determination was neither a smokescreen nor a hunch. It did not rest on the bare fact of Plaintiff's arrest, but on specific findings, made after an adversarial hearing at which Plaintiff was represented and presented evidence, that Plaintiff's conduct had endangered the lives and safety of others and had caused serious injury to a police officer. And it connected those findings to the question *Antonyuk* identified as the "gravamen" of the character inquiry: whether Plaintiff can "be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." 120 F.4th at 985 (quoting N.Y. Penal L. § 400.00(1)(b)). Plaintiff identifies no evidence that the stated grounds were a pretext for some reason "untethered to dangerousness." *Id.* at 986.

Nor did the decision rest on Plaintiff's candor or on law-breaking as such. The hearing officer's report does not mention candor, and its observation that Plaintiff's traffic offenses "reflect poorly on his ability to comply with the law and rules, including laws and rules related to the possession of a licensed firearm," Dkt. No. 47-16 at 14, concerns whether Plaintiff can be trusted to follow the rules governing the safe possession of a firearm. That the hearing officer did not credit Plaintiff's account of the collision, *see id.* at 11–12, reflects ordinary fact-finding, not a separate ground for revocation. The revocation thus rested on a finding that Plaintiff's conduct endangered others, not on the vague notion of irresponsibility that *Rahimi* declined to accept as a basis for disarmament. *See* 602 U.S. at 701–02.

Because the License Division revoked Plaintiff's license on the basis of a reasoned, evidence-based determination that he could not be entrusted with a firearm without endangering others, the Court rejects his as-applied challenge to §§ 5-11 and 5-10(n).[16]

**III. Plaintiff's Remaining Claims for Relief**

Because the Court concludes that §§ 5-11 and 5-10(n) are constitutional both on their face and as applied to Plaintiff, his remaining requests for relief fail as well. Plaintiff contends that the City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the challenged rules are an official municipal policy. Dkt. No. 50 at 21–22. But a municipality may be held liable under § 1983 only where its policy caused a constitutional violation; absent an underlying violation, there is no basis for *Monell* liability. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). For the same reason, Plaintiff's claims for compensatory and nominal damages fail. Finally, the complaint's prayer for relief sought to enjoin enforcement of § 5-30(c)(1), Compl. at 8; *see id.* ¶ 38, and Plaintiff's summary judgment briefing seeks instead to enjoin § 5-11 "as enforced through" § 5-10(n), Dkt. No. 41 at 10. Plaintiff has abandoned his challenge to § 5-30(c)(1), and because he has not succeeded on the merits of his challenge to §§ 5-11 and 5-10(n), he is not entitled to a permanent injunction against their enforcement. *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987).

---

[16] A licensee might also contend that the License Division's procedures do not satisfy the Due Process Clause, or that under the Second Amendment, the regime operates in practice to deny the right to keep and bear arms, as *Bruen* recognized may occur where "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right." 597 U.S. at 38 n.9; *see Milani v. City of New York*, No. 25-cv-1732 (S.D.N.Y. 2025), Compl. ¶ 1, Dkt. No. 5 (challenging New York City's allegedly prolonged, multi-month delays in processing firearm license applications under the Second Amendment). Plaintiff raises neither challenge in the instant action, and the Court does not address them.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to close Dkt. Nos. 37 and 44, enter judgment for Defendants, and close the case.

SO ORDERED.

Dated: November 4, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge